No. 16-35866

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

CENTER FOR BIOLOGICAL DIVERSITY; WESTERN WATERSHEDS
PROJECT; GEORGE WUERTHNER; AND PAT MUNDAY,

*Plaintiff-Appellants*,

v.

RYAN ZINKE, Secretary U.S. Department of the Interior, in his official capacity;
JIM KURTH, Acting Director, U.S. Fish and Wildlife Service, in his official
capacity; and UNITED STATES FISH AND WILDLIFE SERVICE,

*Defendant-Appellees*,

and

STATE OF MONTANA and

DEPARTMENT OF FISH, WILDLIFE AND PARKS,

*Defendant-Intervenor-Appellees*.

_____

Appeal from the United States District Court for the District of Montana
Case No. 2:15-cv-00004—Hon. Sam E. Haddon, District Judge

_____

## APPELLANTS' BRIEF

_____

Timothy J. Preso
Jenny K. Harbine
Aurora R. Janke
Earthjustice
313 East Main Street
Bozeman, MT 59715
(406) 586-9699 | Phone
(406) 586-9695 | Fax

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiff-Appellants Center for Biological Diversity, Western Watersheds Project, George Wuerthner, and Pat Munday hereby certify that none of the Plaintiff-Appellant organizations has a parent corporation and that no publicly held corporation holds 10 percent or more of any of the Plaintiff-Appellant's organization's stock.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT ........................................................ 1

STATEMENT OF THE ISSUES........................................................... 2

STATEMENT REGARDING ADDENDUM ........................................... 3

STATEMENT OF THE CASE............................................................... 3

I.     ARCTIC GRAYLING................................................................ 3

II.    ESA LISTING HISTORY ......................................................... 7

III.   THE 2014 FINDING ................................................................ 9

IV.    DISTRICT COURT DECISION ................................................ 10

SUMMARY OF THE ARGUMENT .................................................... 11

ARGUMENT ................................................................................... 13

I.     STANDARD OF REVIEW....................................................... 16

II.    THE ENDANGERED SPECIES ACT ....................................... 17

III.   FWS UNLAWFULLY FAILED TO EVALUATE WHETHER THE
       ARCTIC GRAYLING'S UNOCCUPIED HISTORICAL RANGE
       REPRESENTS A "SIGNIFICANT PORTION OF ITS RANGE" IN
       WHICH IT IS THREATENED OR ENDANGERED ................................. 18

       A.     Congress Intended the Term "Range" to Include a Species'
              Unoccupied, Historical Range........................................... 19

       B.     FWS's Definition of "Range" Relies on an Impermissible
              Reading of the ESA........................................................ 27

IV.    FWS ARBITRARILY CONCLUDED THAT FLUVIAL
       GRAYLING POPULATIONS ARE INCREASING................................... 32

       A.     FWS Disregarded Record Evidence of Population Declines.............. 33

B.  FWS's Own Data Undermine its Conclusion of Increasing Population Trends in the Big Hole and Ruby Rivers ..........................39

V.  FWS ARBITRARILY DISMISSED THREATS OF LOW STREAM FLOWS AND HIGH STREAM TEMPERATURES ...................................42

A.  Habitat Restoration Efforts Have Not Eliminated Threats from Low Stream Flows and High Stream Temperatures ...........................42

1.  High Temperatures and Low Flows Threaten Arctic Grayling in the Big Hole River....................................................43

2.  High Temperatures and Low Flows Threaten Arctic Grayling in the Centennial Valley and Madison River ...........47

B.  FWS Arbitrarily Evaluated Climate Change Impacts to Arctic Grayling................................................................................49

VI.  FWS IRRATIONALLY DISMISSED THREATS OF SMALL POPULATION SIZE.......................................................................55

A.  FWS Irrationally Dismissed the Impact of Low Population Numbers on Long-Term Genetic Viability .........................................56

B.  FWS Irrationally Concluded that Environmental Disturbances Will Not Threaten Grayling, Despite Their Small Population Size ......................................................................................59

CONCLUSION .....................................................................................63

# TABLE OF AUTHORITIES

## FEDERAL CASES

Alaska Oil & Gas Ass'n v. Pritzker,
  840 F.3d 671 (9th Cir. 2016) ...............................................................41

Ariz. Cattle Growers' Ass'n v. Salazar,
  606 F.3d 1160 (9th Cir. 2010) .....................................................16, 50

Brown v. Gardner,
  513 U.S. 115 (1994)......................................................................21

Chevron U.S.A. Inc. v. Nat. Res. Def. Council,
  467 U.S. 837 (1984)............................................. 18-19, 19, 20, 27, 29

Conner v. Burford,
  848 F.2d 1441 (9th Cir. 1988) ..........................................................34

Defenders of Wildlife v. Jewell,
  176 F. Supp. 3d 975 (D. Mont. 2016), appeal dismissed (Oct. 7,
  2016) .............................................................................24, 31

Defenders of Wildlife v. Norton,
  258 F.3d 1136 (9th Cir. 2001) .......................22-23, 23, 24, 28, 29, 32

Duncan v. Walker,
  533 U.S. 167 (2001).............................................................22

F.C.C. v. Fox Television Stations, Inc.,
  556 U.S. 502 (2009).................................................. 14, 16-17, 49, 55

Greater Yellowstone Coal., Inc. v. Servheen,
  665 F.3d 1015 (9th Cir. 2011) ...................... 16, 38, 50, 53, 54, 55, 62

In re Polar Bear Endangered Species Act Listing  & § 4(d)  Rule Litig.,
  748 F. Supp. 2d 19, 25–26 (D.D.C. 2010)..........................................25

I.N.S. v. Cardoza-Fonseca,
  480 U.S. 421 (1987)..........................................................22

Japanese Vill., LLC v. Fed. Transit Admin.,
  843 F.3d 445 (9th Cir. 2016) .............................................................16

Kmart Corp. v. Cartier, Inc.,
  486 U.S. 281 (1988)..................................................................20

Marsh v. Or. Nat. Res. Council,
  490 U.S. 360 (1989)..................................................................16

Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,
  545 U.S. 967 (2005)...................................................14, 27, 47

Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.,
  475 F.3d 1136 (9th Cir. 2007) ...............................................16, 41

Organized Vill. of Kake v. U.S. Dep't of Agric.,
  795 F.3d 956 (9th Cir. 2015) (en banc),
  cert. denied sub nom. Alaska v. Organized Vill. of Kake, Alaska,
  136 S. Ct. 1509 (2016).............................................14, 47, 49, 62

San Luis & Delta-Mendota Water Auth. v. Locke,
  776 F.3d 971 (9th Cir. 2014) ................................................34

Sullivan v. Everhart,
  494 U.S. 83 (1990).................................................................20, 26

Tennessee Valley Auth. v. Hill,
  437 U.S. 153 (1978).................................................................17

Tucson Herpetological Soc'y v. Salazar,
  556F.3d 870 (9th Cir. 2009) ..................................23, 28, 29, 30, 41

United States v. Hill,
  896 F. Supp. 1057 (D. Colo. 1995)........................................25

WildEarth Guardians v. Jewell,
  134 F. Supp. 3d 1182 (D. Ariz. 2015) ..................................31

## STATUTES AND LEGISLATIVE MATERIALS

5 U.S.C.   § 706..............................................................11, 16
           § 706(2)(A) ....................................................16

16 U.S.C. § 1531(a)(1)...............................................................................17
§ 1531(b)..................................................................................17,31
§ 1532(6)................................ 2, 17, 18, 19, 20, 21, 23, 24, 26, 27
§ 1532(16).........................................................................8, 17
§ 1532(20)........................ 2, 17, 18, 19, 20, 21, 24, 26, 27, 56
§ 1533(a).......................................................................................2
§ 1533(a)(1)........................................................................18, 42
§ 1533(a)(3)......................................................................25
§ 1533(b)(1)(A).................................................2, 18, 38, 55
§ 1533(c)(1).......................................................................21
§ 1539(j)(2)(A)..............................................................22, 25
§ 1540(c)...........................................................................1
§ 1540(g)...........................................................................1

28 U.S.C. § 1291.....................................................................................1
§ 1331.........................................................................................1

H.R. Rep. No. 95-1625 (1978), reprinted in 1978 U.S.C.C.A.N. 9,453............21, 31

H.R. Rep. No. 412, 93rd Cong., 1 Sess. (1973)........................................32

## REGULATIONS AND ADMINISTRATIVE MATERIALS

48 Fed. Reg. 39,941 (Sept. 2, 1983) ...............................................25

49 Fed. Reg. 1,057 (Jan. 9, 1984) ....................................................25

59 Fed. Reg. 37,738 (July 25, 1994).................................................7

72 Fed. Reg. 20,305 (Apr. 24, 2007) ...............................................8

75 Fed. Reg. 54,708 (Sep. 8, 2010) .................................................4

79 Fed. Reg. 37,578 (July 1, 2014)........................... 18, 21, 23, 24, 26, 28

79 Fed. Reg. 49,384 (Aug. 20, 2014)................................................3

80 Fed. Reg. 34,595 (June 17, 2015) ...............................................25

## OTHER AUTHORITIES

Aldo Leopold, <u>A Sand County Almanac</u> (1966) ......................................................32

Concise Oxford American Dictionary (2006) .........................................................25

Federal Rule of Appellate Procedure 4(a)(1)(B) ......................................................1

# JURISDICTIONAL STATEMENT

(A)    The district court had subject-matter jurisdiction over this challenge to federal-agency action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 16 U.S.C. § 1540(c) and (g) (jurisdiction over citizen suits).

(B)    This Court has jurisdiction over this appeal from the district court's Memorandum Opinion and Order and Final Judgment granting summary judgment to Federal Defendants and State Defendant-Intervenors and denying summary judgment to Plaintiff-Appellants.  28 U.S.C. § 1291.

(C)    The district court issued an order denying Plaintiff-Appellants' motion for summary judgment and granting Federal Defendants and State Defendant-Intervenors' motions for summary judgment on September 2, 2016.  ER-1:30-31.[1] The district court entered judgment the same day.  ER-1:1-2.  Appellants noticed their appeal of the district court's order on October 21, 2016, ER-2:119-121, within the time allowed by Federal Rule of Appellate Procedure 4(a)(1)(B).

(D)    Because this appeal arises from an appealable final decision by the district court, this Court has jurisdiction under 28 U.S.C. § 1291.

---

[1] Citations to Plaintiff-Appellants' excerpts of record ("ER") are to volume and page number.

# STATEMENT OF THE ISSUES

1. Whether the U.S. Fish and Wildlife Service ("FWS") unlawfully failed to evaluate whether the Arctic grayling's unoccupied, historical habitat is a significant portion of its range in which it is threatened or endangered, in violation of 16 U.S.C. § 1532(6), (20) and § 1533(a) of the Endangered Species Act ("ESA").

2. Whether FWS arbitrarily concluded that Arctic grayling populations were increasing, where it failed to acknowledge or explain contrary evidence of population declines, in violation of 16 U.S.C. § 1533(a) and (b)(1)(A) of the ESA.

3. Whether FWS arbitrarily concluded that Arctic grayling are not threatened by low stream flows and high water temperatures, despite record evidence that stream temperatures regularly exceed harmful thresholds and are likely to become hotter with the advance of climate change, in violation of 16 U.S.C. § 1533(a) and (b)(1)(A) of the ESA.

4. Whether FWS arbitrarily concluded that small population sizes do not threaten Arctic grayling, even while populations remain below accepted levels for long-term viability and the Ruby River population that FWS deemed essential to survival of the Arctic grayling population as a whole exhibits only 42 breeding adult fish, in violation of 16 U.S.C. § 1533(a) and (b)(1)(A) of the ESA.

**STATEMENT REGARDING ADDENDUM**

Pursuant to Circuit Rule 28-2.7, pertinent authorities are set forth in an addendum at the end of this brief.

**STATEMENT OF THE CASE**

## I.  ARCTIC GRAYLING

The upper Missouri River basin located in Southwest Montana contains the only remaining population of Arctic grayling in the continental United States. Revised 12-Month Finding on a Petition to List the Upper Missouri River Distinct Population Segment of Arctic Grayling as an Endangered or Threatened Species, 79 Fed. Reg. 49,384 (Aug. 20, 2014) ("2014 Finding") (ER-2:33).  Arctic grayling are a cold-water fish in the Salmonidae family.  ER-2:34.  With a unique appearance, they have long, trout-like bodies with deeply forked tails and a sail-like dorsal fin.  Id.



ER-3:229.

Arctic grayling have two general life-history forms:  Fluvial (river or stream-dwelling) and adfluvial (lake-dwelling).  ER-2:40.  Historically, the fluvial

form predominated in the upper Missouri River basin with only a few native adfluvial populations.  ER-2:40-41.  The two forms are not interchangeable.  Although introductions of fluvial grayling to lake environments have given rise to successful adfluvial populations, attempts to establish fluvial populations from adfluvial grayling have failed.  ER-2:41.  Accordingly, in assessing the status of grayling, FWS has recognized the importance of conserving both life-history forms to ensure species survival.  ER-2:68.  As FWS explained in 2010, "preservation of both native ecotypes in their native habitats is essential to conservation of the [distinct population segment]."  Revised 12-Month Finding to List the Upper Missouri River Distinct Population Segment of Arctic Grayling as Endangered or Threatened, 75 Fed. Reg. 54,708 (Sept. 8, 2010) ("2010 Finding") (ER-2:73, ER-2:107).

Grayling were once abundant in all of the major rivers of the upper Missouri basin, including the mainstem of the Missouri River and the Smith, Sun, Jefferson, Madison, Gallatin, Big Hole, Beaverhead, and Red Rock Rivers, along with adfluvial populations in a small number of lakes, including Red Rock Lakes in the Centennial Valley and Elk Lake.  ER-2:35-36.  Despite this past abundance, the distribution of native grayling, especially fluvial populations, dramatically declined in the 1900s as a result of habitat fragmentation, degradation of riparian corridors,

dewatering, and predation by nonnative trout.  See ER-2:36-37, ER-2:51-56, ER-2:62-63.

Today, just six native subpopulations of grayling remain in the upper Missouri River basin:  Big Hole River, Ennis Reservoir/Madison River, Centennial Valley, Mussigbrod Lake, Miner Lake, and Ruby River.  ER-2:47.  Only two of these populations are entirely fluvial: the Big Hole River population and the recently reintroduced Ruby River population.  Id., ER-2:37.  Both fluvial populations are precariously small and occupy a fraction of their historical range.  See ER-2:36-37, ER-2:47.  At the time of the 2014 Finding challenged in this case, FWS estimated that the Ruby River population contained just 42 breeding adults.  ER-2:47.

Arctic grayling have specific habitat requirements that constrain their distribution.  ER-2:40.  They subsist in low-to-moderate gradient streams and rivers with ample pool habitat and quality riparian areas.  Id., ER-2:51.  Cool water, maintained by intact riparian areas and sufficient stream flows, is essential to their health and survival.  ER-2:51-52.  Stream temperatures above 70 degrees Fahrenheit are harmful to Arctic grayling and stream temperatures above 77 degrees Fahrenheit are lethal.  ER-2:40, ER-2:52.

Stream dewatering poses a significant threat to Arctic grayling because low flows correlate with high water temperatures.  ER-2:52, ER-2:92-93.  While high

water temperatures currently affect several Arctic grayling populations, ER-2:52-53, the problem is especially acute for the Big Hole River population, which occurs primarily adjacent to irrigated, agricultural lands, ER-2:49, ER-4:628, and where "[s]ummer water temperatures consistently exceed 21°C (70°F) in the mainstem of Big Hole River," ER-2:52.

Climate change threatens to worsen habitat conditions for Arctic grayling. See ER-2:55-56, ER-2:106-107.  In recent years, the Big Hole River, upper Madison River, and Red Rock Creek have experienced earlier snowmelt runoff. ER-2:55.  Air temperatures have increased over the past several decades and are predicted to further rise.  ER-2:55-56, ER-2:104.  Droughts, also associated with climate change and correlated with population declines, have increased in severity and duration in Montana over the past 50 years, leading to dewatering and high stream temperatures that can reduce habitat connectivity.  ER-2:67, ER-2:103, ER-2:106.  In 2010, FWS acknowledged that "these effects will continue and likely increase into the foreseeable future[,]" and therefore "climate change could lead to further range contractions of Arctic grayling of the upper Missouri River and may increase the species' risk of extinction over the next 30 to 40 years as climate impacts interact with existing stressors."  ER-2:105.

## II.    ESA LISTING HISTORY

FWS first considered whether to list upper Missouri River Arctic grayling under the Endangered Species Act ("ESA") more than 30 years ago. ER-2:33. At that time, FWS determined that listing the Arctic grayling as threatened or endangered "was possibly appropriate" but that FWS lacked sufficient data to support that determination. Id. In 1991, two of the Appellants, George Wuerthner and the Biodiversity Legal Foundation (now Center for Biological Diversity ("the Center")), petitioned FWS to list the fluvial Arctic grayling as an endangered species. Id. In response, FWS determined in 1994 that listing the grayling was "warranted but precluded" by higher-priority listing obligations and assigned it a listing priority number of nine, indicating that threats to the population were imminent but of a relatively low magnitude. Id.; see Finding on a Petition to List the Fluvial Population of the Arctic Grayling as Endangered, 59 Fed. Reg. 37,738 (July 25, 1994).

Responding to severe declines in grayling numbers and chronically low flows in the Big Hole River due to increased irrigation pressure, see ER-2:107 (describing decline), the Center and Western Watersheds Project challenged FWS's 1994 finding, ER-2:33. FWS raised the listing priority of the grayling to a three, which is the highest priority number afforded a distinct population segment, and entered a settlement agreement in which it committed to determine the

grayling's status by April 2007.  Id.  However, when the time came for FWS's

listing decision, FWS determined the upper Missouri River grayling no longer

warranted protection—not because the grayling's status had improved, but rather

based on an assertion that they no longer qualified as a distinct population

segment.[2]  Id.; Revised 12-Month Finding for Upper Missouri River Distinct

Population Segment of Fluvial Arctic Grayling, 72 Fed. Reg. 20,305 (Apr. 24,

2007).  The Center, Federation of Fly Fishers, Western Watersheds Project, George

Wuerthner, and Pat Munday challenged this decision in federal court as well,

resulting in yet another agreement by FWS to determine whether listing was

warranted by August 30, 2010.  ER-2:34.

     Under this agreement, FWS determined in 2010 that the upper Missouri

River population of Arctic grayling qualified as a distinct population segment that

warranted protection, but again determined that protection was precluded by other,

higher-priority listing actions.  ER-2:107-108.  Specifically, FWS explained that

Arctic grayling were threatened by among other things low abundance, stream

dewatering, and habitat degradation that could be exacerbated by climate change.

See id.  With respect to the Big Hole, FWS concluded that the population had

_____

[2] The ESA defines "species" to include "any distinct population segment of any
species of vertebrate fish or wildlife which interbreeds when mature," 16 U.S.C.
§ 1532(16), thereby allowing discrete populations—not just entire species or
subspecies—to be listed.

"declined by one half between the early 1990s and the early 2000s," ER-2:88, and that loss of the population, which FWS then considered the only native fluvial population, "would create the highest risk [to the distinct population segment], as this population contains much of the genetic diversity present in the species within the Missouri River basin … and is the only example of the fluvial ecotype," ER-2:109.

On September 9, 2011, as part of a comprehensive settlement of litigation concerning the agency's substantial backlog of ESA listing decisions, FWS reached an agreement with the Center stipulating that FWS would submit either a proposed listing rule for the upper Missouri River population of Arctic grayling or a not-warranted finding no later than the end of 2014. ER-2:34.

## III.    THE 2014 FINDING

On August 20, 2014, FWS reversed its 2010 Finding and concluded that the upper Missouri River distinct population segment did not warrant listing. See ER-2:33. In the 2014 Finding, FWS dismissed previously acknowledged threats to Arctic grayling due to small population sizes, habitat degradation, dewatering, and climate change, even though the conditions causing those threats remained largely unchanged from 2010. See ER-2:45-48, ER-2:52-54, ER-2:55-56, ER-2:67-69.

In reversing its position on these points, FWS relied on increasing population numbers as circumstantial evidence that Arctic grayling are likely to

persist notwithstanding these threats. Among others, FWS relied on stable or increasing population sizes to dismiss threats due to: degradation of riparian areas and increased water temperatures, ER-2:58; the effects of climate change, ER-2:55-56; and small population sizes and loss of genetic diversity, ER-2:68. See also ER-1:20 (District court order, stating "[t]he 2014 Finding is underpinned by the conclusion, based on scientific data, that the majority of Arctic grayling populations within the DPS are stable or increasing"). In short, FWS's conclusion that grayling populations were stable or increasing in size underscored its dismissal of nearly every threat to the species' survival.

## IV. DISTRICT COURT DECISION

Plaintiff-Appellants Center for Biological Diversity, Western Watersheds Project, George Wuerthner, and Pat Munday filed a complaint challenging the 2014 Finding in the U.S. District Court for the District of Montana on February 5, 2015. ER-2:178. The complaint alleged that FWS: 1) improperly relied on unsupported population increases and arbitrarily concluded that Arctic grayling are not threatened by small population size; 2) failed to rationally evaluate whether Arctic grayling are threatened by low stream flows and high water temperatures, including the effects of climate change; and 3) failed to analyze whether Arctic grayling's lost historical range constitutes a "significant portion of its range" in which it is threatened or endangered. See ER-2:178-220. In an order dated

September 2, 2016, the district court upheld the 2014 Finding, rejecting each of Plaintiff-Appellants' claims. ER-1:3-31.

## SUMMARY OF THE ARGUMENT

This Court should reverse the district court's judgment upholding FWS's decision not to list the upper Missouri River distinct population segment of Arctic grayling as threatened or endangered. FWS violated the ESA and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, by determining that Arctic grayling—which persist in only a fraction of their historical range at perilously low numbers—are not threatened by increasing water temperatures, reduced flows, random environmental disturbances, or the ever-increasing threat of climate change. Further, FWS's 2014 Finding not to list was an irrational reversal of its 2010 decision that listing was warranted but precluded.

FWS violated the ESA by concluding that Arctic grayling are not imperiled throughout a significant portion of their range without first analyzing the grayling's unoccupied historical range. Because the ESA directs FWS to consider a species' status in all portions of its range and portions of the grayling's historical range remain suitable habit for grayling, FWS should have considered—consistent with the ESA and Circuit precedent—whether such historical range was significant. See infra, Argument, Part III.

FWS violated the ESA by repeatedly relying on illusory population increases to dismiss acknowledged threats to grayling. The record does not provide an adequate basis for FWS's conclusion that Arctic grayling populations, especially the fluvial Big Hole River and Ruby River populations, are increasing in size. To the contrary, a detailed genetics study and state population monitoring data for this same time period reflect decreases in both the Big Hole River and Ruby River populations—evidence that FWS overlooked in determining that these populations are increasing in size. Significantly, even the unpublished and unexplained data on which FWS relied show fluctuating populations in the Big Hole and Ruby Rivers, not steadily increasing populations. See <u>infra</u>, Argument, Part IV.

FWS further violated the ESA by unlawfully dismissing threats of increasing water temperatures and decreasing stream flows. Habitat restoration efforts have not adequately ameliorated high stream temperatures, which continue to exceed levels harmful to grayling. Contrary to FWS's claim, the presence of coldwater tributaries alone is insufficient to offset these impacts where most tributary reaches also exhibit high water temperatures. Moreover, these key threats are exacerbated by climate change—a fact that FWS cast aside using guesswork instead of science—with no guarantee that voluntary measures to improve grayling habitat

will continue or keep up with the growing peril to grayling.  See infra, Argument, Part V.

FWS's conclusion that small population size is not a threat to grayling further violated the ESA.  In so concluding, FWS arbitrarily relied on the purported viability of the fledgling Ruby River population to provide necessary redundancy for the Big Hole River population—the only other remaining fluvial population— despite FWS's prior determination that several more years of data were required to establish a viable Ruby River population and evidence that each of these populations are too small to ensure long-term genetic diversity.  See infra, Argument, Part VI.

## ARGUMENT

This case is about the plight of a cold water fish in a warming world.  The upper Missouri River basin population of Arctic grayling in Montana has been wiped out in nearly all of its historical habitat.  Where they still persist, Arctic grayling face a barrage of threats, including low stream flows, rising water temperatures, and a very small population.  These threats are worsened by the current and predicted impacts of a warming climate, which are expected to further reduce stream flows and increase water temperatures in the grayling's last refuges.

Because of these threats, FWS determined in 2010 that ESA protection was necessary to ensure that Arctic grayling did not go extinct in the lower-48 states.

In its 2014 Finding, FWS reversed that prior determination.  It is a well-established principle of administrative law that "'[u]nexplained inconsistency" between agency actions is "a reason for holding an interpretation to be an arbitrary and capricious change."  Organized Vill. of Kake v. U.S. Dep't of Agric., 795 F.3d 956, 966 (9th Cir. 2015) (en banc), cert. denied sub nom. Alaska v. Organized Vill. of Kake, Alaska, 136 S. Ct. 1509 (2016) (quoting Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 981 (2005)).  Thus, an agency must provide a "reasoned explanation" for its reliance on factual findings that contradict earlier findings.  F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009); see also Organized Vill. of Kake, 795 F.3d at 968-69 (discussing standard in Fox Television).

A recurring theme in this case is FWS's failure to provide the requisite explanation for its reversal on key threats to the species, such as the threats of high stream temperatures and low flows, including the exacerbating effects of climate change.  FWS also failed to rationally explain in its 2014 Finding why Arctic grayling populations are large enough to withstand short-term and long-term threats to their persistence when they have not yet met minimum thresholds that, just four years earlier, FWS deemed appropriate.  And the agency provided no basis for its decision in 2014 to evaluate population trends based on just a few

years of inconclusive data, when, in 2010, FWS definitively concluded that Arctic grayling populations were declining based on decades of record evidence.

Overall, FWS seemed to suggest that its 2014 Finding was appropriate because conditions for Arctic grayling are not as bad as they once were. While any improvement to the dire conditions for Arctic grayling is important and laudable, FWS failed to explain why such improvements are enough, particularly where population sizes remain perilously small, there is evidence of their decline, stream temperatures continue to exceed harmful levels, and habitat conditions will worsen as climate change advances.

At the very outset, however, FWS failed to grapple with the loss of more than 90 percent of the range that Arctic grayling once occupied in the upper Missouri River basin. FWS did not address whether the elimination of Arctic grayling from their former strongholds and their relegation to a handful of museum-piece populations was alone sufficient to warrant federal protection and restoration efforts under the ESA. In so doing, FWS defied controlling direction from Congress and this Court.

Accordingly, Plaintiff-Appellants Center for Biological Diversity, et al., request that this Court reverse the district court, set aside the 2014 Finding, and remand the issue to FWS for a rational determination regarding the need to protect Arctic grayling under the ESA.

# I.    STANDARD OF REVIEW

This Court reviews <u>de novo</u> the district court's grant of summary judgment. <u>Greater Yellowstone Coal., Inc. v. Servheen</u>, 665 F.3d 1015, 1023 (9th Cir. 2011). FWS's decision not to list a species as threatened or endangered under the ESA is reviewed under the APA, 5 U.S.C. § 706.  <u>Id.</u>  Under the APA, a reviewing court "shall" set aside agency actions, findings, or conclusions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." <u>Japanese Vill., LLC v. Fed. Transit Admin.</u>, 843 F.3d 445, 453 (9th Cir. 2016) (quoting 5 U.S.C. § 706(2)(A)).

In conducting this review, the Court's job is to "ensure that the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made."  <u>Greater Yellowstone Coal., Inc.</u>, 665 F.3d at 1023 (quoting <u>Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.</u>, 475 F.3d 1136, 1140 (9th Cir. 2007)).  Although this standard of review is narrow, it demands that this Court conduct a "searching and careful" review.  <u>Japanese Vill., LLC</u>, 843 F.3d at 453-54 (quoting <u>Marsh v. Or. Nat. Res. Council</u>, 490 U.S. 360, 378 (1989)).  Even where an agency with "technical expertise" acts "within its area of competence," the Court "need not defer to the agency when the agency's decision is without substantial basis in fact."  <u>Ariz. Cattle Growers' Ass'n v. Salazar</u>, 606 F.3d 1160, 1163 (9th Cir. 2010).  Further, an agency must provide a "reasoned

explanation" for its reliance on factual findings that contradict earlier findings by the agency. Fox Television, 556 U.S. at 515.

## II. THE ENDANGERED SPECIES ACT

The ESA seeks to safeguard our nation's natural heritage by responding to threats of species extinction in order to conserve imperiled species and their habitat. See 16 U.S.C. § 1531(b). The ESA represents a commitment "to halt and reverse the trend toward species extinction—whatever the cost" by rejecting the "economic growth and development untempered by adequate concern and conservation" that gave this country its legacy of extinctions. Tennessee Valley Auth. v. Hill, 437 U.S. 153, 154 (1978); 16 U.S.C. § 1531(a)(1).

To receive protection under the ESA, a species must first be listed as endangered or threatened. An "endangered species" is "any species which is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A "threatened species" is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." Id. § 1532(20). The term "species" includes "any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." Id. § 1532(16). Under these definitions, FWS can list as endangered or threatened a distinct population segment of a vertebrate fish species.

FWS must base its listing determinations on "the best scientific and commercial data available" considering the following five factors: "(a) the present or threatened destruction, modification, or curtailment of its habitat or range; (b) overutilization for commercial, recreational, scientific, or educational purposes; (c) disease or predation; (d) the inadequacy of existing regulatory mechanisms; or (e) other natural or manmade factors affecting its continued existence." Id. § 1533(a)(1), (b)(1)(A).

## III. FWS UNLAWFULLY FAILED TO EVALUATE WHETHER THE ARCTIC GRAYLING'S UNOCCUPIED HISTORICAL RANGE REPRESENTS A "SIGNIFICANT PORTION OF ITS RANGE" IN WHICH IT IS THREATENED OR ENDANGERED

The 2014 Finding is unlawful at the outset because it does not evaluate whether the 90 percent of the Arctic grayling's historical range in the upper Missouri River basin that the grayling currently does not occupy is a "significant portion of its range," as required by the ESA's definitions of "endangered" and "threatened" species. 16 U.S.C. § 1532(6), (20). In upholding FWS's omission, the district court improperly afforded controlling weight to FWS's interpretation of the relevant ESA language in the Service's 2014 "Final Policy on Interpretation of the Phrase 'Significant Portion of Its Range' in the Endangered Species Act's Definitions of 'Endangered Species' and 'Threatened Species,'" 79 Fed. Reg. 37,578 (July 1, 2014) ("SPR Policy"), without confronting definitive evidence of congressional intent that precludes FWS's position. See Chevron U.S.A. Inc. v.

Nat. Res. Def. Council, 467 U.S. 837, 843 n. 9 (1984) (courts "must reject administrative constructions which are contrary to clear congressional intent").

Accordingly, this Court should reverse the district court.

### A. Congress Intended the Term "Range" to Include a Species' Unoccupied, Historical Range

FWS's dismissal of the Arctic grayling's historical range cannot be sustained because it conflicts with clear congressional intent that listing decisions assess the status of a species throughout "all or a significant portion of its range." 16 U.S.C. § 1532(6), (20) (emphasis added); see Chevron, 467 U.S. at 842-43 (holding that "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress").

The ESA's "significant portion of its range" language is particularly significant for Arctic grayling. Fluvial Arctic grayling were once abundant in all of the major rivers of the upper Missouri River basin, occupying an estimated 1,250 river miles. ER-2:35-36. However, habitat fragmentation, degradation of riparian corridors, dewatering, and encroachment by nonnative trout have wiped out fluvial grayling from all but 10 percent of their historical range in the Missouri River system. See ER-2:37, ER-2:51-56, ER-2:61-62.

FWS's 2014 Finding categorically excluded the Arctic grayling's currently unoccupied habitat from consideration in determining whether the species faces threats in any "significant portion of its range." ER-2:70. FWS explicitly defined

"range" as "the general geographical area within which that species can be found at the time FWS … makes any particular status determination." Id. In addressing the grayling's range curtailment, the 2014 Finding stated only that "despite fragmentation, sufficient habitat remains intact and is currently supporting multiple, viable, fluvial and adfluvial Arctic grayling populations." ER-2:58. Thus, while evaluating the Arctic grayling's status in its current range, FWS did not analyze whether currently unoccupied, historical Arctic grayling habitat is a "significant portion of its range."

This was error. "In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." Sullivan v. Everhart, 494 U.S. 83, 89 (1990) (quoting Kmart Corp. v. Cartier, Inc., 486 U.S. 281, 291 (1988)). If, "employing traditional tools of statutory construction," this Court "ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." Chevron, 467 U.S. at 843 n.9.

Here, contrary to FWS's analysis, both the language and the design of the ESA required FWS to consider whether the Arctic grayling's currently unoccupied, historical range is "a significant portion of its range" in which it faces threats. FWS's interpretation of the term "range" to include only a species' current range for purposes of 16 U.S.C. § 1532(6) and (20) conflicts with the Act's related

requirement in § 1533(c)(1) to specify "over what portion of [a species'] range it is endangered or threatened." Legislative history for § 1533(c)(1) demonstrates that, in that provision, Congress used "[t]he term 'range' … in the general sense to refer[] to the historical range of the species." H.R. Rep. No. 95-1625, at 18 (1978), reprinted in 1978 U.S.C.C.A.N. 9,453, 9,468 (emphasis added).

There is no basis to conclude that Congress meant to confer a different meaning to the term "range" in § 1532(6) and (20) than in § 1533(c)(1). The SPR Policy, upon which the 2014 Finding relied, claimed that Congress's use of the term "range" in § 1533(c)(1) is different, because it is "informational rather than … substantive." SPR Policy, 79 Fed. Reg. at 37,583. However, there is no meaningful distinction between the language Congress used in directing FWS to determine in the first step of the listing process whether a species is threatened or endangered in "a significant portion of its range," 16 U.S.C. § 1532(6), (20), and in directing FWS in the next step of the listing process to publish its finding regarding "over what portion of [a species'] range it is endangered or threatened," id. § 1533(c)(1). In advancing different interpretations of the word "range" in related statutory provisions requiring FWS to make a finding and then publish the result of that finding, FWS failed to overcome the "presumption that a given term is used to mean the same thing throughout a statute." Brown v. Gardner, 513 U.S. 115, 118 (1994).

Indeed, another provision of the ESA using the term "range" reinforces its reference to both the current and historical range of a species. In 16 U.S.C. § 1539(j)(2)(A), Congress "authorize[d] the release … of any population … of an endangered species or a threatened species outside the current range of such species if the Secretary determines that such release will further the conservation of such species." 16 U.S.C. § 1539(j)(2)(A) (emphasis added). Congress's use of the word "current" to qualify the word "range" in § 1539(j)(2)(A), indicates Congress's understanding that the unqualified use of the word "range" elsewhere in the ESA referred to a species' current and historical range. See I.N.S. v. Cardoza-Fonseca, 480 U.S. 421, 432 (1987) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (quotation omitted). If "range" already meant "current range," the word "current" in § 1539(j)(2)(A) would impermissibly be rendered meaningless. See Duncan v. Walker, 533 U.S. 167, 174 (2001) ("It is our duty to give effect, if possible, to every clause and word of a statute.") (quotation omitted). Consistently, Congress's unqualified use of "range" in the ESA encompasses both current and historical range.

This interpretation of the term "range" conforms with this Court's precedent. In Defenders of Wildlife v. Norton, this Court determined that the full phrase "in

22

danger of extinction throughout ... a significant portion of its range" is ambiguous. 258 F.3d 1136, 1141 (9th Cir. 2001) ("Defenders").  However, Defenders found no ambiguity in the term "range" itself, confirming that FWS's analysis must include "major geographical areas in which [the species] is no longer viable but once was." Id. at 1145-46.  In reaffirming this holding in Tucson Herpetological Soc'y v. Salazar, the Court made clear that while "the appropriate criteria for testing "significance" [is] undefined, … the Secretary must develop some rational explanation for why the lost and threatened portions of a species' range are insignificant before deciding not to designate the species for protection."  566 F.3d 870, 877 (9th Cir. 2009) (citation omitted).  In sum, the term "significant" bears further agency interpretation; the term "range" is clear.

The Service's attempt in the SPR Policy to overcome this Court's prior holdings relied almost exclusively on its claim that Congress's intention to focus on imperilment in a species' current range can be inferred from the ESA's present-tense language defining an "endangered species" as one that "'is in danger of extinction' throughout all or a significant portion of its range."  SPR Policy, 79 Fed. Reg. at 37,583 (quoting 16 U.S.C. § 1532(6)).  According to FWS, a species cannot be currently at risk in areas where it has already been extirpated.  Id. However, FWS places too much weight on verb tense alone.  Although one federal district court found FWS's approach persuasive, that court did not analyze other,

definitive indicators of congressional intent that compel a contrary conclusion, as described above.  See Defenders of Wildlife v. Jewell, 176 F. Supp. 3d 975, 1010 (D. Mont. 2016), appeal dismissed (Oct. 7, 2016) (deferring to SPR Policy interpretation without evaluating contrary arguments).

Further, even assuming, for the sake of argument, that the "present-tense" construction of 16 U.S.C. § 1532(6) and (20) was meant to embody definitive legislative intent, that construction remains entirely consistent with Congress's intent to require consideration of whether currently unoccupied portions of a species' historical range are significant.  In the SPR Policy, FWS claimed that a species cannot be "'in danger' in an area where it no longer exists" because, if it has already been extirpated, there is no current or future undesired event that could bring it harm.  SPR Policy, 79 Fed. Reg. at 37,583.  But the ESA and FWS's own actions show otherwise.  A species that has been extirpated or become extinct has permanently come to an end or no longer exists.  See Defenders, 258 F.3d at 1141 (stating that dictionary defines "extinct" to mean "'has died out or come to an end …. Of a family, class of persons, a race of species of animals or plants:  Having no

living representative'") (quoting Oxford English Dictionary).[3]  But a species is

only permanently gone from a landscape if there remains no reasonable possibility

that it will recolonize that range.[4]  Before _permanent_ extirpation, a species can be

"in danger" in an area where it no longer exists if ongoing activities or conditions

in that area would prevent or hinder the species from recolonizing it.  Where

habitat remains suitable, the ESA contains numerous tools for recovering lost

range once a species is listed.  _See_ 16 U.S.C. § 1533(a)(3) (requiring designation of

"critical habitat" for listed species); _id._ § 1539(j)(2)(A) (authorizing release of

experimental populations "outside the current range of [the] species").

In the case of Arctic grayling, FWS has identified 161 miles of still-suitable

but "currently unoccupied" habitat for Arctic grayling within the Big Hole River.

ER-2:56.  Although FWS failed to consider whether this suitable habitat

---

[3] _See also_ In re Polar Bear Endangered Species Act Listing & § 4(d) Rule Litig., 748 F. Supp. 2d 19, 25–26 (D.D.C. 2010) (ordinary meaning of phrase "in danger of extinction" means "exposed to the harm of no longer existing") (citing United States v. Hill, 896 F. Supp. 1057, 1062 (D. Colo. 1995)); _Extirpate_, Concise Oxford American Dictionary (2006) ("Extirpate" means "to destroy completely").

[4] This is consistent with FWS's prior interpretation of the ESA, under which it has delisted or proposed delisting of species as "extinct" only after verifying that there are no individuals left and no potential that the population may recover.  _See, e.g.,_ Final Rule, Removal of Sampson's Pearly Mussel from the List of Endangered and Threatened Wildlife, 49 Fed. Reg. 1,057 (Jan. 9, 1984); Final Rule, Deregulation of the Longjaw Cisco and the Blue Pike, 48 Fed. Reg. 39,941 (Sept. 2, 1983); _see also_ Proposed Rule, Removing Eastern Puma (=Cougar) From the Federal List of Endangered and Threatened Wildlife, 80 Fed. Reg. 34,595 (June 17, 2015).

constitutes a significant portion of the species' range, it recognized Arctic grayling conservation efforts in this area. Id. (acknowledging that 42 percent of "Tier III" Arctic grayling habitat, which is suitable but currently unoccupied, is enrolled in the Arctic grayling Candidate Conservation Agreement with Assurances). The same is true in other areas—such as the Madison River and Red Rock Lakes—for which FWS acknowledged in 2010 that "ongoing habitat-related threats … may be making unoccupied habitat unsuitable for Arctic grayling, and may thus limit the recovery potential of the DPS." ER-2:95. Accordingly, not even FWS has claimed that Arctic grayling are permanently extinct from these areas, yet an analysis of current or future threats in those areas could well suggest that Arctic grayling are "in danger" of becoming so. SPR Policy, 79 Fed. Reg. at 37,583. Thus, contrary to FWS's position, a species can be endangered or threatened where it does not exist.

In sum, the "statutory language" of the ESA, "as well as the language and design of the statute as a whole" compels an interpretation of the term "range" in 16 U.S.C. § 1532(6), (20), that includes the Arctic grayling's current and unoccupied historical range. Sullivan, 494 U.S. at 89 (quotation omitted). Accordingly, FWS's reliance on the SPR Policy to dismiss the Arctic grayling's historical range in the 2014 Finding was unlawful.

**B.**     **FWS's Definition of "Range" Relies on an Impermissible Reading of the ESA**

Even if the term "range" in 16 U.S.C. § 1532(6), (20), were ambiguous—and it is not for the reasons stated above—FWS's treatment of the Arctic grayling's historical range must be set aside because it relied on an unreasonable interpretation of the statutory language.  <u>See</u> <u>Chevron</u>, 467 U.S. at 845 (a court must defer only to an agency's "reasonable" interpretations of ambiguous statutory language).

According to the district court, FWS's adoption of the SPR Policy negated prior Ninth Circuit precedent regarding the meaning of "significant portion of its range" in the Act.  <u>See</u> ER-1:26-27.  The court relied on <u>Brand X</u>, which held that "[a] court's prior judicial construction of a statute trumps an agency construction otherwise entitled to <u>Chevron</u> deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute[.]"  <u>Brand X</u> <u>Internet Servs.</u>, 545 U.S. at 982.  However, even assuming for the sake of argument that the term "range" is ambiguous, <u>Brand X</u> does not rescue FWS's interpretation in the SPR Policy.  <u>Brand X</u> affirms that an agency may choose only among <u>reasonable</u> interpretations of ambiguous statutes.  <u>Id.</u> at 986.

Here, FWS's reliance on the SPR Policy to reject consideration of whether the Arctic grayling's historical range is "significant" was unreasonable and cannot be sustained.  First, for the reasons described above, clear indicators of

27

congressional intent compel a finding that the term "range" in the ESA consistently refers to both current and unoccupied historical range.  See supra, Argument, Part III.A.  Second, this Court in Defenders and Tucson Herpetological Society defined the outer limits of reasonableness in interpreting the ESA's "significant portion of its range" language.  Specifically, as this Court concluded, "where … it is on the record apparent that the area in which the [species] is expected to survive is much smaller than its historical range, the Secretary must at least explain her conclusion that the area in which the species can no longer live is not a 'significant portion of its range.'"  Defenders, 258 F.3d at 1148; accord Tucson Herpetological Soc'y, 566 F.3d at 875-77.  Under the SPR Policy, however, FWS never even considers whether a species' historical range is "significant" because the policy defines "range" to categorically exclude historical range.  SPR Policy, 79 Fed. Reg. at 37,583.

The SPR Policy nevertheless stated that FWS may comply with the ESA's requirement to consider historical range by evaluating the effect of the species' lost range on its conservation status in its current range.  Id. at 37,584.  However, not only does this explanation ignore the difference between evaluating the significance of a species' lost historical range, as required by Defenders, and evaluating a species' status in its current range, it also repeats the same error that this Court identified in assessing FWS's prior interpretation of the "significant

portion" language. As this Court has twice explained, it is insufficient for FWS to rely on a species' viability in its current range to deem other portions of its range, including unoccupied historical range, so insignificant that they are completely absent from the required analysis. Tucson Herpetological Soc'y, 566 F.3d at 877; Defenders, 258 F. 3d at 1141-42. To find otherwise would be to impermissibly conflate a species' imperilment throughout all of its range with imperilment in any portion of that range. Defenders, 258 F.3d at 1141-42 (stating that "[s]uch a redundant reading of a significant statutory phrase is unacceptable").

Indeed, Tucson Herpetological Society rejected under step two of the Chevron analysis the same arguments that FWS again advanced in its SPR Policy—namely, that it is proper to consider a species' lost historical range solely by evaluating its effect on the species' persistence in its current range. See Tucson Herpetological Soc'y, 566 F.3d at 877-78. As the Court held, it is "insufficient … to point to one area or class of areas where [species] populations persist to support a finding that threats to the species elsewhere are not significant; the ESA requires a more thorough explanation." Id. at 877. The Court nevertheless upheld FWS's ultimate conclusion that the species' lost, historical range in that case was not significant based on "supplemental reasons that do not depend on persistence alone." Id. at 877-78. The Court observed in Tucson Herpetological Society that FWS had considered "lost habitat in a site-specific manner," id. at 877, and

concluded among other things that lost historical range was a relatively small percentage of the species' overall range and "most of the lizard's lost range was converted to agricultural or commercial uses decades ago, is generally not recoverable, and is thus of limited significance to the lizard's long-term survival," id. at 878. Ultimately, the Court upheld FWS's decision based on these considerations, but reiterated that FWS's sole reliance on the persistence of a species within its occupied range to disregard threats in unoccupied, historical range would be inconsistent with the ESA. Id. at 877-88.

In contrast with Tucson Herpetological Society, here FWS did not engage in the "site-specific" significance analysis of the Arctic grayling's lost historical range and offered no reasons for its omission "that do not depend on persistence alone." Id. at 877-78. Further, while Tucson Herpetological Society emphasized FWS's finding that the species' lost historical range was "generally not recoverable" as an important basis for upholding FWS's determination, id. at 878, here FWS conceded that at least 161 miles of currently unoccupied, historical habitat within the Big Hole River remain "suitable" for grayling, ER-2:56. FWS offered no reasons for deeming these and other areas categorically insignificant that this Court has not already considered and rejected.[5]

_____

[5] The 2014 Finding does not disclose whether other areas of the Arctic grayling's currently unoccupied range contain suitable habitat.

For this same reason, the two federal district courts that have upheld the Service's reliance on the SPR Policy's methodology for considering the effect of lost historical range on the viability of species are not persuasive.  See Defenders of Wildlife v. Jewell, 176 F. Supp. 3d at 1010 (rejecting facial challenge to SPR Policy); WildEarth Guardians v. Jewell, 134 F. Supp. 3d 1182, 1193-94 (D. Ariz. 2015) (rejecting challenge to application of the SPR policy, noting that the policy directs some consideration of historical range and FWS did so in that case).  Those cases did not acknowledge that this Court requires site-specific consideration of a species' status within its historical range, not simply a consideration of the impact of lost historical range on the species within its current range, as directed by the SPR Policy.

Further, and more fundamentally, FWS's approach must be rejected because it contradicts "[t]he ultimate goal of the Endangered Species Act," which "is the conservation of the ecosystem on which all species, whether endangered or not, depend for survival."  H.R. Rep. No. 95-1625, at 16, 1978 U.S.C.C.A.N. at 9,466; see also 16 U.S.C. § 1531(b) (purpose of ESA is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved").  In requiring FWS to list a species that is endangered in any "significant portion of its range," rather than requiring range-wide endangerment before the ESA's protections can adhere, Congress made a choice

not to forsake species where they might go extinct simply because they are abundant elsewhere. See Defenders, 258 F.3d at 1144-45 (citing H.R. Rep. No. 412, 93rd Cong., 1 Sess. (1973) and historical application of the Act). As the Court observed:

> The text of the ESA and its subsequent application seems to have been guided by the following maxim:
>
>> There seems to be a tacit assumption that if grizzlies survive in Canada and Alaska, that is good enough. It is not good enough for me … . Relegating grizzlies to Alaska is about like relegating happiness to heaven; one may never get there.

Id. at 1145 n.10 (quoting Aldo Leopold, A Sand County Almanac 277 (1966)).

Yet FWS's application of the SPR Policy to Arctic grayling condoned the disappearance of this species over vast quantities of its native range simply because some remnant of the species was preserved. Such an interpretation contrary to the ESA's purpose cannot be sustained.

## IV. FWS ARBITRARILY CONCLUDED THAT FLUVIAL GRAYLING POPULATIONS ARE INCREASING

Not only did FWS fail to evaluate the Arctic grayling's status over the vast portions of its historical range from which it has been eliminated, FWS arbitrarily discounted the dire threats facing the species where it still exists. As an overarching error, the 2014 Finding cited purportedly increasing numbers of Arctic grayling to dismiss a host of previously acknowledged threats to the species, supra,

Statement of the Case, Part III, but failed to rationally support this conclusion in the face of record evidence of population declines.

In 2010, FWS determined that three of the five Arctic grayling subpopulations then constituting the distinct population segment, including the fluvial population in the Big Hole River, "appear[ed] to be at low abundance (perhaps no more than 650 to 2,000 adults per population)" and had declined in abundance in the past few decades. ER-2:107. With respect to the Big Hole River population, the 2010 Finding explained that the "best available data" showed that the adult population "declined by one half between the early 1990s and the early 2000s." ER-2:88; see also ER-2:107 (noting that the "effective number of breeding adults declined by half during the past 15 years"). Yet just four years later, FWS concluded that the Big Hole River population was increasing, ER-2:47, and for the first time identified an increasing population trajectory for the Ruby River as well, based on just three years of data, id.; see ER-3:290. In so concluding, FWS irrationally disregarded record evidence of population declines and arbitrarily relied exclusively on evidence that actually demonstrates fluctuating Arctic grayling populations in the Big Hole and Ruby Rivers.

## A.   FWS Disregarded Record Evidence of Population Declines

FWS arbitrarily failed to justify its conclusions that the Big Hole and Ruby River populations were increasing, ER-2:47, in light of record evidence—including

both genetic data and population monitoring data—documenting population declines. While FWS may rely on the opinions of its experts, it "cannot ignore available biological information." Conner v. Burford, 848 F.2d 1441, 1454 (9th Cir. 1988); cf. San Luis & Delta-Mendota Water Auth. v. Locke, 776 F.3d 971, 995 (9th Cir. 2014) ("An agency complies with the best available science standard so long as it does not ignore available studies, even if it disagrees with or discredits them."). Here, FWS's failure even to acknowledge record evidence of population declines in the 2014 Finding, let alone justify the agency's opposite conclusion, was arbitrary.

First, a 2014 report by four scientists at the FWS Abernathy Fish Technology Center, ER-3:316-405 (DeHaan et al. 2014), concluded that the number of effective breeders in the Big Hole River was declining. The number of effective breeders in the population ("$N_b$") is determined through genetic analysis and is a key measure of species population—indeed, it is the measure on which FWS relied to document population increases. See ER-2:47 ("$N_b$ denotes the number of breeding adults that contributed genetics to a sample of offspring from a given population."). DeHaan reviewed historical genetic data from the Big Hole River for four different time periods: 1987-1988; 1995-1996; 2005- 2006; and 2011- 2012. ER-3:321. Based on these data, DeHaan concluded that the effective number of breeders for the Big Hole River declined between 1987 and 2012, with

the lowest level in 2011-2012 measuring just 102.8 breeders. ER-3:332, ER-3:354 (Table 2).

Second, state population monitoring data for the Big Hole and Ruby Rivers do not support FWS's claim that these populations are increasing in size. The State monitoring data, consisting of annual monitoring reports for the Big Hole and Ruby Rivers and an unpublished chart summarizing catch-per-mile statistics in the Big Hole River, show fluctuating populations, not steadily increasing ones. See ER-3:458-459 (catch-per-mile statistics); ER-3:460-495 (2012 Monitoring Report); ER-3:406-435 (2013 Monitoring Report).

For the Big Hole River, state-compiled catch-per-mile statistics show fluctuating numbers in both the Big Hole River mainstem and its tributaries between 2008 and 2013. See ER-3:458 (showing that the mainstem catch-per-mile rates rose in 2009 and 2010, declined in 2011, rose in 2012, and declined again in 2013 to the lowest level since 2008); ER-3:459 (showing that the tributary catch-per-mile rate decreased in 2009 and 2010, increased in 2011 and 2012, and then declined by nearly half in 2013). Notably, in 2013, the catch-per-mile rate in both mainstem and tributaries significantly declined. ER-3:458-459 (showing a decline from 1.35 to 0.47 fish-per-mile in the mainstem and from 7.39 to 3.75 fish-per-mile in tributaries). State monitoring reports from 2012 and 2013 recorded a

similar decline from 250 fish in the Big Hole River in 2012 to just 118 fish in 2013.  Compare ER-3:480, with ER-3:423.

These reports show an even more critical situation for Arctic grayling in the Ruby River.  Between 2012 and 2013 the overall capture in the Ruby River decreased from 106 fish in 2012 to just 37 fish in 2013.  Compare ER-3:489, with ER-3:430.  As shown below, on a fish-per-mile basis, the Ruby River population steadily declined between 2010 and 2013:



ER-3:235.  Yet, the 2014 Finding provided no basis for dismissing the documented decrease in the Ruby River population, and indeed, failed even to mention it.  See ER-2:47, ER-2:57.

With respect to the Big Hole River, FWS dismissed the 2013 population monitoring data in a footnote stating that lower abundance estimates in 2013 were "likely due to unusually high flows … that likely decreased capture efficiency." See ER-2:50. But, to the extent unusually high flows affected catch rates in 2013, those flows were observed in the Big Hole River mainstem, see ER-3:423 (noting that catch rates were "lower in the Big Hole River reaches"), where catch rates are typically much lower, and not in Big Hole tributaries, where catch rates are typically much higher, id.; ER-3:480 (noting in 2012 that catch rates were higher in tributary reaches than Big Hole River reaches). That is, FWS offered no basis for dismissing a catch rate that declined nearly 50 percent in 2013 in Big Hole River tributaries, see ER-3:459, based on high stream flows that affected only the Big Hole River mainstem, ER-3:423. Accordingly, FWS offered no reasonable basis for dismissing in their entirety monitoring data documenting Big Hole River population declines in 2013.[6]

In upholding FWS's population findings, the district court relied on "numerous citations" to DeHaan and state population monitoring data in the 2014

_____

[6] Moreover, even if FWS had captured the same number of fish in the Big Hole River mainstem in 2013 as in 2012, it would increase the total 2013 capture amount to just 138 fish, which is still well below the 250 fish caught in 2012. Compare ER-3:480, ER-3:495 (showing 30 fish captured in Big Hole mainstem in 2012), with ER-3:423, ER-3:435 (showing 10 fish captured in Big Hole mainstem in 2013).

Finding as evidence that "the Service considered each study, weighed the data based on its expertise, and incorporated it appropriately into its final analysis." ER-1:19. But FWS's selective references to DeHaan in the 2014 Finding do not suggest that FWS meaningfully considered this evidence in concluding that the Big Hole River and Ruby River populations were increasing when FWS repeatedly failed to acknowledge DeHaan's evidence of a declining number of effective breeders in the Big Hole River. See ER-2:55 (citing DeHaan to show a decline between the 1980s and the mid-2000s, but failing to acknowledge that DeHaan shows this decline extending through 2012); ER-2:56 (citing DeHaan for the principle that grayling can increase in abundance despite a warming climate, but ignoring evidence of a decline in the effective number of breeders in the Big Hole River when air temperatures were warmer, see ER-3:343-344). Similarly, as discussed above, despite selectively citing state population monitoring data, FWS irrationally dismissed monitored population declines in 2013 for the Big Hole River, and entirely failed to acknowledge such declines for the Ruby River. See ER-2:50.

Accordingly, FWS's population determinations violate the agency's obligations to rely on the best available science, 16 U.S.C. § 1533(b)(1)(A), and to articulate a rational connection between the facts found and the choices made, Greater Yellowstone Coal., Inc., 665 F.3d at 1023.

## B. FWS's Own Data Undermine its Conclusion of Increasing Population Trends in the Big Hole and Ruby Rivers

Not only did FWS arbitrarily disregard evidence of population declines, FWS's conclusions that the Big Hole and Ruby River populations were increasing are undermined by the very data on which the agency relies. To support increases in these populations, the 2014 Finding relied exclusively on an unpublished 2014 PowerPoint presentation by Montana Fish Wildlife and Parks scientist Robb Leary, ER-3:273-299 ("Leary 2014, unpublished data"). See ER-2:50 (citing Leary 2014, unpublished data as the source for the number of breeding adults in the Big Hole River); ER-2:55 (same); ER-2:58 (same).

However, Leary's genetic data document fluctuating, rather than increasing, populations. Although Leary's data for the Big Hole River show that the number of effective breeders increased in 2012 and 2013, the data also show that for the prior five years—from 2007 to 2011—the number of breeders both increased and decreased, and at all times remained low. ER-3:279. FWS's reliance on just two years of apparent increases to assign a population trend is particularly striking in comparison to the 2010 Finding, which assessed population trends based on decades, not a few isolated years. See ER-2:87-88 (noting a seven percent average annual decline in the Big Hole grayling population between the early 1990s and the early 2000s), ER-2:107 (noting a decline in abundance "during the past few

39

decades").[7]

Despite the significant change from FWS's prior assessment of population trends—not to mention contrary genetic and population monitoring data—FWS failed to provide any explanation of why just two years of apparent population growth following a prolonged period of fluctuating numbers evinces an overall positive population trend in the Big Hole River.  See ER-2:87-88, ER-2:107, ER-2:47 (Table 3), ER-2:55 (discussing Leary 2014, unpublished data).  Notably, Leary's unpublished data comprise a series of graphs that include no analysis and no conclusion that the data evince an increasing population trend.  Yet the 2014 Finding all but ignores the fluctuating effective breeder levels from 2007 to 2011 and instead describes Leary's data as showing that "[s]ince the late 2000s, the number of breeding Arctic grayling has increased in the Big Hole River."  ER-2:55, but see ER-2:50 (Table 4, stating that the number of breeding adults was approximately 100 from 2007 to 2011).

Similarly, Leary's population data for the Ruby River fail to support FWS's conclusion that the population is increasing in size.  See Table 3, ER-2:47.  Over just three years of monitoring in the Ruby River, Leary's data show a population

_____

[7] Further, FWS failed to explain Leary's sudden increase in the number of breeding adults in 2012, when DeHaan's data reflect a decrease for this same time. Compare ER-3:332, ER-3:354 (Table 2), with ER-3:279; see also ER-2:50.

decline from 2010 to 2011 followed by a population increase in 2012.  ER-3:290.

That is, the only genetic data cited in the 2014 Finding regarding the Ruby River

population show just one year of a population increase in a population that is so

small that FWS estimates that it contains just 42 breeding adults.  ER-2:47.

Nevertheless, FWS relied exclusively on these data as evidence of an upward trend

in the effective number of breeders without explaining how a one-year increase

amounts to an overall trend.  ER-2:57 (stating that "the number of breeding adults

has trended upward over the past 3 years").

In sum, the genetic data upon which FWS relied do not support FWS's

unqualified claims that the Big Hole and Ruby River populations are increasing in

size.  In light of contrary record evidence that FWS failed to acknowledge or

distinguish, FWS's population findings for the Big Hole and Ruby Rivers were

arbitrary.  Alaska Oil & Gas Ass'n v. Pritzker, 840 F.3d 671, 679 (9th Cir. 2016)

(stating the Court "'must defer to the agency's interpretation of complex scientific

data' so long as the agency provides a reasonable explanation for adopting its

approach and discloses the limitations of that approach" (emphasis added; quoting

Nw. Ecosystem All., 475 F.3d at 1150)); cf. Tucson Herpetological Soc'y, 566

F.3d at 879 ("If the science on population size and trends is underdeveloped and

unclear, the Secretary cannot reasonably infer that the absence of evidence of

population decline equates to evidence of persistence.").

## V.    FWS ARBITRARILY DISMISSED THREATS OF LOW STREAM FLOWS AND HIGH STREAM TEMPERATURES

FWS compounded its arbitrary assessment of Arctic grayling population trends by dismissing the threats of low stream flows and high stream temperatures that the agency recognized in 2010 and that continue to imperil those populations. ER-2:52-54, ER-2:58, ER-2:67 (explaining that these threats pose the greatest risk to grayling habitat in the Big Hole River and in the shallow lakes of the Centennial Valley). The ESA required FWS to analyze threats to a species due to "the present or threatened destruction, modification, or curtailment of [the species'] habitat or range." 16 U.S.C § 1533(a)(1). In its 2010 assessment of these habitat threats, FWS found low stream flows and high stream temperatures warranted listing the Arctic grayling as threatened or endangered. ER-2:95. In reversing this finding in 2014, FWS failed to rationally analyze these twin threats despite evidence that stream temperatures remain perilously high notwithstanding conservation measures and that climate change is likely to exacerbate these conditions.

### A.    Habitat Restoration Efforts Have Not Eliminated Threats from Low Stream Flows and High Stream Temperatures

FWS irrationally relied on habitat restoration efforts on the Big Hole River—namely the Big Hole River Candidate Conservation Agreement with Assurances ("CCAA") and related Strategic Habitat Conservation Plan, ER-4:496-512—and projects on federal land around the Centennial Valley to mitigate or

eliminate threats to grayling habitat quantity and quality, see ER-2:58. But these restoration efforts, while laudable, are insufficient to ameliorate the ongoing habitat threats of low stream flows and high stream temperatures. Despite these efforts, high temperatures persist in the Big Hole River and in the Centennial Valley and Madison River, and FWS has provided no evidence that the availability of cooler refuge habitat is sufficient to offset the resulting threat to grayling.

    1.    High Temperatures and Low Flows Threaten Arctic Grayling in the Big Hole River

First, with respect to the Big Hole River, the CCAA aims to reduce irrigation withdrawals and water diversion in the upper Big Hole River Watershed, ER-4:630-631, but it is inadequate to mitigate the threats of low stream flows. To address dewatering issues caused by irrigation, the CCAA sets "minimum flow targets" for the Big Hole River, which represent the "baseline or minimum values to ensure instream flow resources sufficient to promote recovery of grayling above their current population level." ER-4:640. Notably, however, under the CCAA these minimum flow targets are expected to be achieved just 75 percent of the time in years with average snowpack, even after ten years of implementing the CCAA. See ER-4:642-643. The situation is worse in years with less-than-average snowpack, when the CCAA expects the minimum targets to be achieved less than 75 percent of the time. ER-4:642 ("The Agencies estimate that after 10 years of Agreement implementation, streamflows in the Project Area will meet or exceed

target values at least 75% of the days during the spring period and during the summer and fall period in years with an average snowpack."); <u>see also</u> ER-2:53 (same); ER-4:501 (Big Hole River Strategic Habitat Conservation Plan) (same).  In other words, the CCAA itself anticipates insufficient water in the Big Hole River one out of every four days in years with average snow pack and expects even more days of insufficient flows in years of less-than-average snowpack.

In establishing the 75-percent goal, the CCAA acknowledged that voluntary landowner efforts alone would be insufficient to ensure adequate streamflow given other variables.  ER-2:53 (explaining threshold, stating that "many other factors influence instream flows in the Big Hole River that are outside the control of landowners (e.g., snowpack, precipitation)"); <u>see also</u> ER-4:643 (indicating that, even with the CCAA in place, these other factors will continue to affect the adequacy of stream flows).  Consistent with this prediction, Big Hole stream flow has increased on average from 50 to 78 percent of the minimum flow target since implementation of the CCAA in 2006.  <u>See</u> ER-2:53.  However, FWS previously acknowledged that these flows—which are still well below minimum targets—are inadequate for grayling, which need 100 percent of the "baseline" target flow <u>at all times</u> to avoid endangerment, <u>see</u> ER-4:640 (flow targets are "baseline or minimum values … to promote recovery of grayling above their current population

level"); see also ER-2:93 (the CCAA will "reduce[], but not eliminate[]" threats of dewatering).

The inadequacy of the CCAA to protect grayling from low flows and thermal threats is further demonstrated by the ongoing high temperatures in the Big Hole River. Although the number of days with water temperatures exceeding the lethal threshold of 77 degrees Fahrenheit in the Big Hole River and its tributaries has decreased between 2010 and 2014, water temperatures continue to reach harmful—and sometimes lethal—levels for grayling in most monitored areas of the Big Hole River and its tributaries. ER-2:52 ("Summer water temperatures consistently exceed 21°C (70°F) in the maintstem of Big Hole River"); ER-3:470 (2012 Monitoring Report showing maximum seasonal temperatures above 70 degrees at nine of eleven monitoring sites); ER-3:415 (2013 Monitoring Report showing maximum seasonal temperatures above 70 degrees at eight of eleven monitoring sites with three sites exceeding 77 degrees); ER-3:246-256 (State data tracking Big Hole water temperatures from 2006 to 2013).

In its 2014 Finding, FWS attempted to minimize the threat of high water temperatures in the Big Hole River by speculating that grayling seek refuge in coldwater tributaries of the Big Hole River when summer water temperatures in the mainstem rise too high. ER-2:52 (citing Vatland et al. 2009 (ER-4:580-593)).

But the sole record evidence on which FWS relied—Vatland <u>et al.</u> 2009—does not bear the weight of this conclusion.

First, to the extent that FWS claimed that "[s]ummer water temperatures within most tributaries are cooler than those observed in some reaches of the mainstem Big Hole River," ER-2:52, this conclusion is undermined by the fact that water temperatures in most monitored Big Hole River tributaries also frequently exceed 70 degrees Fahrenheit during summer months. <u>See</u> ER-3:415, ER-3:470, ER-3:249-252, ER-3:239-245.

Second, even to the extent "coldwater refugia" exist in tributaries, Vatland does not document their actual use by grayling, let alone in sufficient numbers to offset persistent exposure to high water temperatures at the population level. To the contrary, the Vatland study, which tracked Arctic grayling movement in the Big Hole River, ER-4:587, saw "[l]imited movement" during the summer, ER-4:590, when access to thermal refugia is most important, ER-2:52. Furthermore, FWS was aware of the Vatland study—and even cited it—in 2010, describing it as a study "investigating the availability and use of coldwater thermal refugia for Arctic grayling and other resident fishes." ER-2:96. FWS's awareness of the Vatland study at that time did not alter its conclusion that "[e]specially in the Big Hole River, dewatering from irrigation represents a past and present threat to Arctic grayling." ER-2:93. FWS arbitrarily failed to justify a different conclusion

based on the same evidence in 2014.  See Organized Vill. of Kake, 795 F.3d at 966

("'Unexplained inconsistency' between agency actions is 'a reason for holding an

interpretation to be an arbitrary and capricious change.'") (citing Brand X Internet

Servs., 545 U.S. at 981).

Given the evidence of high temperatures in most tributaries and the absence

of evidence that Arctic grayling are accessing any existing thermal refugia, FWS's

reliance on thermal refugia to dismiss the threat of high water temperatures in the

Big Hole River was arbitrary.

> ## 2.    High Temperatures and Low Flows Threaten Arctic Grayling in the Centennial Valley and Madison River

Habitat restoration efforts also have been inadequate to address high water

temperatures for grayling populations in the Centennial Valley (Red Rock Lakes)

and the Madison River where water temperatures can exceed harmful levels—a

concern that has persisted since the 2010 Finding.  See ER-2:53-54 (identifying

"[i]ncreased water temperatures" as an issue for these two populations).  Although

the 2014 Finding identified improved habitat conditions in the Centennial Valley

resulting from efforts on National Wildlife Refuge lands as a basis for dismissing

habitat threats in general, ER-2:58, the 2014 Finding relied exclusively on the

existence of thermal refugia to dismiss the specific threat of increased water

temperatures, ER-2:53, ER-2:55.  Despite also citing such refugia as a basis for

dismissing threats in the Madison Valley, FWS cited no evidence at all of thermal refugia for Arctic grayling in the Madison River.  See ER-2:47, ER-2:53-54.

With respect to the Centennial Valley population, FWS dismissed threats of high water temperatures based largely on "the presence of Arctic grayling in the lower 100 m of East Shambow Creek in 1994."  ER-2:53 (citing Mogen 1996, p. 44).  However, Mogen concluded only that East Shambow Creek, a Centennial Valley tributary, "possibly provid[ed] thermal refugia" to two young grayling found "[o]n one occasion in 1994."  ER-4:653.  While other spring-fed tributaries may be present, ER-2:54, Mogen documented no adult grayling in historical spawning tributaries in the upper Centennial Valley outside of Red Rock Creek, ER-4:651, ER-4:653-654.  As FWS concluded in 2010, the two fish that might have used potentially available thermal refugia in 1994 do not provide an adequate basis for finding that the entire Centennial Valley grayling population will be able to withstand increasing temperatures.  FWS's speculation that this same evidence warranted a different conclusion in 2014 was arbitrary.  Compare ER-2:93 (concluding high water temperatures were a threat despite Mogen 1996, p. 44), with ER-2:53-54 (concluding high water temperatures were not a threat, citing Mogen, 1996, p. 44 and Jaeger 2014b, pers. comm.); see also ER-3:257 (Jaeger 2014b, pers. comm., stating interpretation of the data "is not strai[gh]t forward," and could support finding that warm lake temperatures threaten grayling).

Accordingly, FWS's conclusion that Centennial Valley and Madison River grayling are not threatened by high water temperatures was unsupported by the record and an arbitrary reversal of FWS's contrary 2010 Finding. Organized Vill. of Kake, 795 F.3d at 966 ("A policy change violates the APA 'if the agency ignores or countermands its earlier factual findings without reasoned explanation for doing so'") (citing Fox Television, 556 U.S. at 537).

## B. FWS Arbitrarily Evaluated Climate Change Impacts to Arctic Grayling

FWS's failure to adequately address the current threat to Arctic grayling caused by low flows and high stream temperatures was worsened by FWS's dismissal of the additive impact of climate change on these threats.

Montana already is experiencing the effects of climate change—including higher average air temperatures, more frequent hot extremes and heat waves, earlier snowmelt, and heavier precipitation events as well as drought, ER-2:104-105—and "these effects will continue and likely increase into the foreseeable future," ER-2:105. FWS recognized in 2010 that the effects of climate change "will potentially intensify some of the significant current threats to all Arctic grayling populations in the [distinct population segment]." ER-2:105. FWS's 2014 Finding reversed this conclusion, stating that climate change was not a threat based on the grayling's purported ability to increase their "abundance and distribution, despite a warming climate" and FWS's expectation that riparian

restoration may mitigate climate-change effects.  ER-2:56.  As discussed below,

FWS's 2014 Finding confronted the effects of climate change with guesswork

instead of science.  It is impermissible for the Service to take such "a full-speed

ahead, damn-the-torpedoes approach" to listing decisions when record evidence

points to climate-change threats, "especially given the ESA's 'policy of

institutionalized caution.'"  Greater Yellowstone Coal., Inc., 665 F.3d at 1030

(quoting Ariz. Cattle Growers' Ass'n, 606 F.3d at 1167).

First, FWS irrationally concluded that habitat restoration projects in the Big

Hole and Centennial Valley "that have occurred" will sufficiently ameliorate the

effects of solar radiation on stream temperatures.  ER-2:55-56.  FWS based its

conclusion on decreased water temperatures in the Big Hole River from improved

riparian vegetation that shades waterways and changes channel characteristics to

reduce the surface area affected by solar radiation, and "intact riparian areas" in the

Centennial Valley.  ER-2:56.  But stream temperatures in the Big Hole River and

Centennial Valley are frequently above levels "considered to be physiologically

stressful" for grayling, despite past restoration projects and the presence of intact

riparian areas.  ER-2:52 (citing data from 2012 and 2013 to show that, even after

CCAA implementation, "[s]ummer water temperatures consistently exceed 21°C

(70°F) in the mainstem of [the] Big Hole River"); ER-2:53-54 (discussing

"[i]ncreased water temperatures" present in the Madison River and Centennial Valley).

Moreover, riparian restoration in the Big Hole River and Centennial Valley has no impact on the Madison River grayling population, which also continues to face summer water temperatures in excess of 70 degrees Fahrenheit. ER-2:53.

With respect to the Big Hole River, FWS cherry-picked data from Rock Creek, a Big Hole River tributary, as an "example" to show temperature reductions in response to restoration efforts. See ER-2:56 (citing Table 4, ER-2:50). But Rock Creek is not representative of Big Hole River tributaries, which almost universally exhibit water temperatures exceeding 70 degrees Fahrenheit, even after implementation of CCAA habitat restoration projects. See ER-3:240-243; ER-3:249-250 (showing every tributary but Rock Creek exceeding 70-degree temperatures at least 20 days in 2013 and one tributary exceeding 77-degree temperatures for 4 days in 2013). For example, Deep Creek, a tributary located in Management Segment E where 26 percent of the highest quality "Tier I" spawning and rearing habitat exists, continued to exceed 70-degree temperatures for 29 days in 2013, ER-3:241, ER-3:250, ER-3:221, a decrease of just one day from 2007 levels, when temperatures exceeded 70 degrees 30 days of the year, ER-3:240, ER-3:250.

Accordingly, even if riparian restoration efforts have reduced stream temperatures in some areas, Arctic grayling in most tributaries and the mainstem Big Hole experience no benefit from those efforts. For these fish, restoration efforts have not effectively mitigated current high water temperatures, let alone the future threat of even hotter days and reduced stream flows as climate change advances. See ER-3:448-451 (Null et al. 2013) (stating that "stream temperatures will generally become warmer for more weeks of the year with climate warming"); ER-4:541 (Isaak et al. 2012) (warming "during the next several decades will occur at rates 50–100% faster than in recent decades"); ER-4:615 (Luce and Holden 2009) ("Implications of decreasing flows for aquatic ecology are fairly direct, as reductions in flow directly translate to the quantity and quality of habitat for aquatic species."); ER-2:105 (2010 Finding stating that climate-change impacts "will continue and likely increase into the foreseeable future") (emphasis added). Further, because FWS relied on evidence from the Big Hole River to infer similar results in the Centennial Valley, see ER-2:56 (anticipating intact riparian areas to mitigate the effects of climate change "through similar processes as in the Big Hole River"), this analysis applies equally to undermine FWS's dismissal of these threats to Centennial Valley grayling.

Second, FWS irrationally relied on increasing population trends to dismiss the threat of increased air temperatures on Arctic grayling. See ER-2:55. Record

evidence shows a correlation between rising air temperatures and rising stream temperatures, both directly and indirectly through impacts on other factors such as earlier snow runoff.  See ER-4:530, ER-4:540-542 (Isaak et al. 2012) (discussing direct and indirect impacts of increased air temperatures on increased stream temperatures); ER-3:436-437, ER-3:447-451, ER-3:454-455 (Null et al. 2010) (finding a correlation between increases in air temperature and increases in water temperature, the latter of which continues to be a problem for grayling survival); ER-4:573, ER-4:578 (Kaushal et al. 2010) ("Long term increases in water temperatures of streams and rivers typically coincided with historical increases in mean air temperatures."); see also supra, Argument, Part V.A.1 (discussing persistent high water temperatures in the Big Hole River).  Although FWS's 2014 Finding acknowledged a rise in air temperatures between the 1980s and the mid-2000s, FWS stated that there was no information to conclude that this rise had a "significant effect" on Arctic grayling because there is no evidence that these rising temperatures resulted in consistent Arctic grayling population declines.  ER-2:55.  But it is not enough to cite "[t]he lack of any data showing a population decline" to dismiss this threat, Greater Yellowstone Coal., Inc., 665 F.3d at 1030, especially when, as discussed above, the science indicates that rising air temperatures will impact stream temperatures.  And, as demonstrated above, when stream temperatures are already exceeding harmful levels for grayling, there is a

small margin of error for increasing stream temperatures above already harmful levels, which can "concentrate fishes and thereby increase competition and predation," ER-2:92, "reduce physiological performance, and ultimately reduce survival and reproduction," ER-2:93.  FWS failed to address these impacts of increasing air and water temperatures associated with climate change, which could exacerbate the existing threats of dewatering and high stream temperatures.

Third, FWS's 2014 assessment of the cumulative impacts of dewatering and climate change irrationally relied on scientific "[u]ncertainty about how different temperature and precipitation scenarios could affect water availability" to avoid making any determination about the combined impact of these two threats.  See ER-2:68; see also ER-2:55 ("[W]e use our expert judgment to weigh relevant information, including uncertainty, in our consideration of various aspects of climate change.").  But FWS's reliance on uncertainty to dismiss this cumulative threat is contrary to precedent in this Court that "[i]t is not enough for the Service to simply invoke 'scientific uncertainty' to justify its action."  Greater Yellowstone Coal., Inc., 665 F.3d at 1028.  Instead, Greater Yellowstone Coalition requires FWS to "rationally explain why the uncertainty" justifies its decision, 665 F.3d at 1028, particularly in light of ample record evidence that climate change harms grayling.  "Otherwise, [the Court] might as well be deferring to a coin flip."  Id. FWS's dismissal of the cumulative threat of climate change and dewatering cannot

be justified by scientific uncertainty when FWS failed to reasonably explain why that uncertainty counseled in favor of denying ESA protections.  See id. at 1028-30.  FWS's cumulative impact analysis, like its stand-alone climate change analysis, is arbitrary and unlawful.

## VI.    FWS IRRATIONALLY DISMISSED THREATS OF SMALL POPULATION SIZE

The resiliency of Arctic grayling to survive key habitat threats absent ESA conservation efforts is made even more uncertain by the chronically small size of the isolated subpopulations, see ER-2:87-90, yet another risk that FWS arbitrarily discarded, see ER-2:67-68.  FWS's 2010 Finding concluded that four of the five native grayling populations "appear to be at risk of extirpation in the foreseeable future … simply because they are at low abundance and cannot receive demographic support from other native populations."  ER-2:108.  In 2014, FWS arbitrarily reversed its position and ignored the best available science in concluding that small population sizes will not threaten or endanger grayling in the foreseeable future.  See 16 U.S.C. § 1533(b)(1)(A) (best available science requirement); Fox Television, 556 U.S. at 515-16 (requiring "reasoned explanation" for agency reversal of factual findings).  For this reason too, FWS violated the ESA.

## A. FWS Irrationally Dismissed the Impact of Low Population Numbers on Long-Term Genetic Viability

FWS arbitrarily failed to analyze whether grayling numbers are sufficient to support long-term genetic diversity to reduce overall extinction risk. Despite acknowledging that the various grayling populations in the distinct population segment exist "largely as a collection of isolated populations" with little to no gene flow between them, FWS irrationally disregarded loss of genetic diversity based on FWS's conclusion that "other processes, such as habitat degradation, have a more immediate and greater impact on species persistence." ER-2:67-68. But where FWS dismissed these immediate impacts, it cannot evade a long-term analysis of the species' survival. FWS is required to determine whether the Arctic grayling distinct population segment "is likely to become an endangered species <u>within the foreseeable future</u>," 16 U.S.C. § 1532(20) (emphasis added), a time frame FWS previously applied to encompass long-term genetic effects, ER-2:90 (2010 Finding defining "foreseeable future" as 30 years based on its population viability analysis).

Further, FWS's failure to consider long-term genetic threats to grayling is inconsistent with an expert panel discussion in the record that found the likelihood of long-term persistence dependent on a larger effective population size, preferably 500 individuals or more. <u>See</u> ER-3:258, ER-3:260 (concluding that "persistence of Arctic grayling was likely or very likely up to 50 years in the future <u>when</u>

56

populations had 500 individuals or more") (emphasis added); ER-3:224 (showing expert panel prediction of a 78% likelihood of survival over 50 years for grayling at populations of 500); see also ER-4:527 (Jamieson and Allendorf 2012) (a 500 minimum effective population size should be used "as a guiding principle" in evaluating long-term genetic viability); ER-3:229 ("The long-term, self-sustaining persistence of grayling is realized when four extant populations remain viable with the 95% upper confidence interval for the effective population size estimates includes [sic] 500.") (quoting Montana Arctic Grayling Conservation Plan (2014)).[8]

Notably, the expert panel's predictions for Arctic grayling persistence over 50 years lessened for smaller population sizes, predicting just a 66 percent likelihood of survival for populations of 100, and a 50 percent likelihood of survival for populations of 50. See ER-3:224; see also ER-3:260 (probability ranges between 33 and 66 percent represent a medium likelihood of survival). But,

---

[8] Effective population size ($N_e$) is a separate genetic metric from either breeding adults ($N_b$) or total census population, and refers to the number of individuals that contribute this genetic material to the next generation (i.e. the successful breeders) under a set of idealized assumptions. See ER-2:47 (defining effective population size as "a theoretical size of a population that would result in the same level of inbreeding or genetic drift as that of the population under study"). Generally, effective population size is smaller than the total population and the actual number of breeders. ER-4:514-515 (distinguishing effective population size from effective number of breeders).

despite these predictions that smaller populations face decreased chances of long-term persistence, FWS offered no support for concluding that effective population sizes well below 500—including just 12.5 fish in the Ruby River and 371 fish in the Big Hole River, ER-2:47—are adequate.

FWS's failure to consider long-term genetic viability is further undermined by its 2010 conclusion that "[l]oss of genetic variation relative to the historical condition … represent[ed] a threat to Arctic grayling in the foreseeable future." ER-2:106. Significantly, this conclusion was not based on short-term threats from inbreeding, but on threats to the "long-term adaptive potential" of grayling caused by their low effective population sizes compared to historic numbers. Id. (citing Peterson and Ardren 2009) ("Historically, effective population sizes of Arctic grayling in the Missouri River were estimated to be 1 or 2 orders of magnitude greater (10 to 100 times) than those currently observed."). FWS arbitrarily failed to explain why a comparison between historical population data and current population numbers was no longer relevant to its analysis in 2014 when that comparison underscored its 2010 conclusion that grayling faced genetic threats. See ER-2:68. Where effective population sizes are below the level that FWS's own experts found necessary to support a high likelihood of long-term survival, and that FWS deemed necessary in 2010, FWS's dismissal of long-term genetic threats was arbitrary.

**B.      FWS Irrationally Concluded that Environmental Disturbances Will Not Threaten Grayling, Despite Their Small Population Size**

FWS also arbitrarily concluded that environmental disturbances will not threaten grayling by overstating the redundant value of the exceptionally small fluvial Ruby River population and noting the separation between grayling populations.  See ER-2:68.  Neither rationale supports FWS's conclusion that no threats exist.

First, FWS irrationally relied on the incipient Ruby River population to provide redundancy of fluvial grayling beyond the Big Hole River, which FWS had deemed necessary to minimize the threat of random environmental disturbances—or stochastic events—to fluvial populations.  Both FWS and independent scientists have acknowledged the importance of conserving life-history diversity, especially the fluvial life history, to the conservation of the species as a whole.  ER-2:68 ("Conservation of life-history diversity is important to the persistence of species confronted by habitat change and environmental perturbations."); ER-4:606 (Peterson and Ardren 2009) ("The Big Hole River population represents an important genetic reservoir for the species within the Missouri River basin.").  Accordingly, in 2010, FWS concluded that "the lack of additional fluvial populations [beyond the Big Hole] represents a current threat to the upper Missouri River [distinct population segment]."  ER-2:106.

In 2014, FWS found this concern to be resolved because a purported increase in the number of breeding individuals in the Ruby River population over the last three years was sufficient to provide "a viable replicate of the fluvial ecotype." ER-2:68.  But FWS's conclusion that the Ruby River population is a viable replicate of the Big Hole River population contradicts FWS's own criteria for judging viability, which require "at least 10 years" of monitoring data confirming that "successful stock recruitment exceeds mortality of reproductive adults to successfully compensate for stochastic factors and perpetuate the species within suitable habitats." ER-4:663 (Montana Fluvial Arctic Grayling Restoration Plan (1995)) (emphasis added); see ER-2:90 (citing the 1995 Restoration Plan to define viability for the Ruby River population).  In 2010, FWS reiterated the need for long-term monitoring to determine viability, stating that "at least 5 to 10 more years of monitoring is needed" to determine viability of the Ruby River population. ER-2:108 (emphases added).  Yet just four years later, and without any explanation for its sudden rush to judgment, FWS claimed that the Ruby River population had achieved viability.  ER-2:68.  Furthermore, in reaching this conclusion, FWS failed to acknowledge state monitoring data showing a population decrease from 2012 to 2013.  Compare ER-3:488 (2012 Monitoring Report) (106 grayling in 2012), with ER-3:430 (2013 Monitoring Report) (37 grayling in 2013).  Instead, FWS supported its viability conclusion by once again relying on Leary's unpublished

data showing a single-year increase in the number of breeding individuals in the Ruby River.  See ER-2:57, ER-2:68; see also supra, Argument, Part IV.B. (discussing Leary's Ruby River population data).

Further, even assuming for the sake of argument that the Ruby River population is increasing in size, FWS's own data estimated that the fledgling population has just 42 breeding adults, which cannot provide sufficient redundancy for the Big Hole River.  ER-2:47.  The small size of this population places it at an increased risk of extirpation from environmental disturbances.  In 2010, FWS recognized that "smaller populations" such as the Ruby River population "are more likely to go extinct even if they are stable because they are already close to the extinction threshold, and random environmental events can drive their abundance below that threshold."  ER-2:106; see also ER-4:513 (Palstra and Fraser 2012) (stating that effective population size plays "[a] key role[] in determining the degree to which populations can avoid extinction from demographically, environmentally, or genetically stochastic events").  Yet, FWS's 2014 Finding provides no assurance that the Ruby River population can persist in the face of such environmental events, see ER-2:67-68—including the random loss of genetic diversity or habitat or extreme weather events like droughts or floods, see ER-2:106 (2010 Finding).  In light of the uncertain persistence of this still-small population, FWS's reliance on Arctic grayling in the Ruby River to provide

redundancy of the fluvial life form that FWS deemed essential was unlawful.  See Greater Yellowstone Coal., 665 F.3d at 1028 ("Having determined what is 'necessary,' the Service cannot reasonably rely on something less to be enough.").

Second, FWS relied on the geographic separation of the remaining upper Missouri River grayling populations from one another to address the threat of potential environmental disturbances.  See ER-2:68.  But this separation cannot justify the agency's change of position when the same separation was evident in 2010, and FWS offered no explanation for its newfound faith in 2014 that such separation mitigates threats to grayling.  See ER-2:106; see Organized Vill. of Kake, 795 F.3d at 968-69 (requiring agencies to provide a "reasoned explanation" for conflicting findings).  This is particularly true given that FWS's 2010 population viability analysis revealed that "four of the five extant populations in the upper Missouri River [distinct population segment] … are at moderate (at least 13 percent) to high risk (more than 50 percent) of extinction from random environmental variation."  ER-2:106; ER-4:564-567.  The 2014 Finding failed even to mention the 2010 population viability analysis, let alone explain why it is no longer relevant.

Moreover, to the extent that FWS relied on multiple spawning locations to preserve grayling in the face of environmental disturbances, it stated that spawning access is available to only eleven of twenty populations and that of those eleven

populations, only the largest populations have access to varied spawning locations, which would exclude the Ruby River population.  ER-2:68.  In other words, the 2014 Finding gave no assurance that Ruby River grayling are protected from environmental disturbances through access to multiple spawning locations, adding an additional concern for this population's ability to withstand random environmental disturbances.  Yet, FWS failed to address this risk to the Ruby River population's viability.  In sum, FWS arbitrarily dismissed the threat of environmental disturbances based on the existence of a too-small Ruby River population that is unlikely to survive a catastrophic event.

Because FWS failed to rationally evaluate the threats to Arctic grayling based on their small population sizes, the 2014 Finding was arbitrary and should be set aside.

## CONCLUSION

For the foregoing reasons, Plaintiff-Appellants Center for Biological Diversity, Western Watersheds Project, George Wuerthner, and Pat Munday respectfully request that this Court reverse the judgment of the district court.

Respectfully submitted this 1st day of March, 2017.

_____s/ Jenny K. Harbine_____
Timothy J. Preso
Jenny K. Harbine
Aurora R. Janke
Earthjustice
313 East Main Street
Bozeman, MT 59715
(406) 586-9699 | Phone
(406) 586-9695 | Fax

*Counsel for Plaintiff-Appellants*

## STATEMENT OF RELATED CASES

Counsel for Appellants is unaware of any related cases, within the meaning of Ninth Circuit Rule 28-2.6.

**Form 8.**     **Certificate of Compliance Pursuant to 9th Circuit Rules 28-1.1(f), 29-2(c)(2) and (3), 32-1, 32-2 or 32-4 for Case Number** 16-35866

Note: This form must be signed by the attorney or unrepresented litigant *and attached to the end of the brief.*

I certify that (*check appropriate option*):

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 28-1.1.
The brief is [        ] words or [        ] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☒ This brief complies with the length limits permitted by Ninth Circuit Rule 32-1.
The brief is [ 13,992 ] words or [        ] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 32-2(b).
The brief is [        ] words or [        ] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable, and is filed by (1) ☐ separately represented parties; (2) ☐ a party or parties filing a single brief in response to multiple briefs; or (3) ☐ a party or parties filing a single brief in response to a longer joint brief filed under Rule 32-2(b). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the longer length limit authorized by court order dated [        ]
The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6). The brief is [        ] words or [        ] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable.

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 32-2 (a) and is [        ] words or [        ] pages, excluding the portions exempted by Fed. R. App. P. 32 (f), if applicable. The brief's type size and type face comply with Fed. R .App. P. 32(a)(5) and (6).

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 29-2 (c)(2) or (3) and is [        ] words or [        ] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits set forth at Ninth Circuit Rule 32-4.
The brief is [        ] words or [        ] pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

Signature of Attorney or Unrepresented Litigant [ s/ Jenny K. Harbine ]     Date [ Mar 1, 2017 ]

("s/" plus typed name is acceptable for electronically-filed documents)

*(Rev.12/1/16)*

**STATUTORY ADDENDUM**

# TABLE OF CONTENTS

16 U.S.C. § 1531 ........................................................................................1

16 U.S.C. § 1532(6), (16), and (20) ...........................................................3

16 U.S.C. § 1533(a), (b)(1), and (c)(1) ......................................................4

16 U.S.C. § 1539(j)(2)(A) ...........................................................................7

16 U.S.C. § 1540(c) and (g) ........................................................................8

# 16 U.S.C. § 1531
## Congressional findings and declaration of purposes and policy

**(a) Findings**

The Congress finds and declares that--

**(1)** various species of fish, wildlife, and plants in the United States have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation;

**(2)** other species of fish, wildlife, and plants have been so depleted in numbers that they are in danger of or threatened with extinction;

**(3)** these species of fish, wildlife, and plants are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people;

**(4)** the United States has pledged itself as a sovereign state in the international community to conserve to the extent practicable the various species of fish or wildlife and plants facing extinction, pursuant to--

> **(A)** migratory bird treaties with Canada and Mexico;

> **(B)** the Migratory and Endangered Bird Treaty with Japan;

> **(C)** the Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere;

> **(D)** the International Convention for the Northwest Atlantic Fisheries;

> **(E)** the International Convention for the High Seas Fisheries of the North Pacific Ocean;

> **(F)** the Convention on International Trade in Endangered Species of Wild Fauna and Flora; and

> **(G)** other international agreements; and

**(5)** encouraging the States and other interested parties, through Federal financial assistance and a system of incentives, to develop and maintain conservation programs which meet national and international standards is a key to meeting the Nation's international commitments and to better safeguarding, for the benefit of all citizens, the Nation's heritage in fish, wildlife, and plants.

**(b) Purposes**

The purposes of this chapter are to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, to provide a program for the conservation of such endangered species and threatened species, and to take such steps as may be appropriate to achieve the purposes of the treaties and conventions set forth in subsection (a) of this section.

**(c) Policy**

**(1)** It is further declared to be the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this chapter.

**(2)** It is further declared to be the policy of Congress that Federal agencies shall cooperate with State and local agencies to resolve water resource issues in concert with conservation of endangered species.

For the purposes of this chapter--

…

**(6)** The term "endangered species" means any species which is in danger of extinction throughout all or a significant portion of its range other than a species of the Class Insecta determined by the Secretary to constitute a pest whose protection under the provisions of this chapter would present an overwhelming and overriding risk to man.

…

**(16)** The term "species" includes any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature.

…

**(20)** The term "threatened species" means any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range.

…

**16 U.S.C. § 1533(a), (b)(1), and (c)(1)**
**Determination of endangered species and threatened species**

**(a) Generally**

**(1)** The Secretary shall by regulation promulgated in accordance with subsection (b) of this section determine whether any species is an endangered species or a threatened species because of any of the following factors:

> **(A)** the present or threatened destruction, modification, or curtailment of its habitat or range;

> **(B)** overutilization for commercial, recreational, scientific, or educational purposes;

> **(C)** disease or predation;

> **(D)** the inadequacy of existing regulatory mechanisms; or

> **(E)** other natural or manmade factors affecting its continued existence.

**(2)** With respect to any species over which program responsibilities have been vested in the Secretary of Commerce pursuant to Reorganization Plan Numbered 4 of 1970—

> **(A)** in any case in which the Secretary of Commerce determines that such species should—

> > **(i)** be listed as an endangered species or a threatened species, or

> > **(ii)** be changed in status from a threatened species to an endangered species,

> he shall so inform the Secretary of the Interior; who shall list such species in accordance with this section;

> **(B)** in any case in which the Secretary of Commerce determines that such species should—

(i) be removed from any list published pursuant to subsection (c) of this section, or

(ii) be changed in status from an endangered species to a threatened species,

he shall recommend such action to the Secretary of the Interior, and the Secretary of the Interior, if he concurs in the recommendation, shall implement such action; and

**(C)** the Secretary of the Interior may not list or remove from any list any such species, and may not change the status of any such species which are listed, without a prior favorable determination made pursuant to this section by the Secretary of Commerce.

**(3)**

**(A)** The Secretary, by regulation promulgated in accordance with subsection (b) and to the maximum extent prudent and determinable—

**(i)** shall, concurrently with making a determination under paragraph (1) that a species is an endangered species or a threatened species, designate any habitat of such species which is then considered to be critical habitat; and

**(ii)** may, from time-to-time thereafter as appropriate, revise such designation.

**(B)**

**(i)** The Secretary shall not designate as critical habitat any lands or other geographical areas owned or controlled by the Department of Defense, or designated for its use, that are subject to an integrated natural resources management plan prepared under section 670a of this title, if the Secretary determines in writing that such plan provides a benefit to the species for which critical habitat is proposed for designation.

**(ii)** Nothing in this paragraph affects the requirement to consult under section 1536(a)(2) of this title with respect to an agency action (as that term is defined in that section).

**(iii)** Nothing in this paragraph affects the obligation of the Department of Defense to comply with section 1538 of this title, including the prohibition preventing extinction and taking of endangered species and threatened species.

## (b) Basis for determinations

**(1)(A)** The Secretary shall make determinations required by subsection (a) (1) of this section solely on the basis of the best scientific and commercial data available to him after conducting a review of the status of the species and after taking into account those efforts, if any, being made by any State or foreign nation, or any political subdivision of a State or foreign nation, to protect such species, whether by predator control, protection of habitat and food supply, or other conservation practices, within any area under its jurisdiction, or on the high seas.

…

## (c) Lists

**(1)** The Secretary of the Interior shall publish in the Federal Register a list of all species determined by him or the Secretary of Commerce to be endangered species and a list of all species determined by him or the Secretary of Commerce to be threatened species. Each list shall refer to the species contained therein by scientific and common name or names, if any, specify with respect to each such species over what portion of its range it is endangered or threatened, and specify any critical habitat within such range. The Secretary shall from time to time revise each list published under the authority of this subsection to reflect recent determinations, designations, and revisions made in accordance with subsections (a) and (b) of this section.

…

…

**(j) Experimental populations**

…

(2)(A) The Secretary may authorize the release (and the related transportation) of any population (including eggs, propagules, or individuals) of an endangered species or a threatened species outside the current range of such species if the Secretary determines that such release will further the conservation of such species.

…

**16 U.S.C. § 1540(c) and (g)**
**Penalties and Enforcement**

…

**(c) District court jurisdiction**

The several district courts of the United States, including the courts enumerated in section 460 of Title 28, shall have jurisdiction over any actions arising under this chapter. For the purpose of this chapter, American Samoa shall be included within the judicial district of the District Court of the United States for the District of Hawaii.

…

**(g) Citizen suits**

**(1)** Except as provided in paragraph (2) of this subsection any person may commence a civil suit on his own behalf—

> **(A)** to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof; or

> **(B)** to compel the Secretary to apply, pursuant to section 1535(g)(2)(B)(ii) of this title, the prohibitions set forth in or authorized pursuant to section 1533(d) or 1538(a)(1)(B) of this title with respect to the taking of any resident endangered species or threatened species within any State; or

> **(C)** against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under section 1533 of this title which is not discretionary with the Secretary.

The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce any such provision or regulation, or to order the Secretary to perform such act or duty, as the case may be. In any civil suit commenced under subparagraph (B) the district court shall

compel the Secretary to apply the prohibition sought if the court finds that the allegation that an emergency exists is supported by substantial evidence.

**(2)**

**(A)** No action may be commenced under subparagraph (1)(A) of this section—

**(i)** prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator of any such provision or regulation;

**(ii)** if the Secretary has commenced action to impose a penalty pursuant to subsection (a) of this section; or

**(iii)** if the United States has commenced and is diligently prosecuting a criminal action in a court of the United States or a State to redress a violation of any such provision or regulation.

**(B)** No action may be commenced under subparagraph (1)(B) of this section—

**(i)** prior to sixty days after written notice has been given to the Secretary setting forth the reasons why an emergency is thought to exist with respect to an endangered species or a threatened species in the State concerned; or

**(ii)** if the Secretary has commenced and is diligently prosecuting action under section 1535(g)(2)(B)(ii) of this title to determine whether any such emergency exists.

**(C)** No action may be commenced under subparagraph (1)(C) of this section prior to sixty days after written notice has been given to the Secretary; except that such action may be brought immediately after such notification in the case of an action under this section respecting an emergency posing a significant risk to the well-being of any species of fish or wildlife or plants.

**(3)**

**(A)** Any suit under this subsection may be brought in the judicial district in which the violation occurs.

**(B)** In any such suit under this subsection in which the United States is not a party, the Attorney General, at the request of the Secretary, may intervene on behalf of the United States as a matter of right.

**(4)** The court, in issuing any final order in any suit brought pursuant to paragraph (1) of this subsection, may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate.

**(5)** The injunctive relief provided by this subsection shall not restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any standard or limitation or to seek any other relief (including relief against the Secretary or a State agency).

…

# CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of March, 2017, I electronically filed the foregoing Appellants' Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Participants in the case will be served by the appellate CM/ECF system.

_____ s/ Jenny K. Harbine _____